Civ. No. 11-1710 (GAG)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**BERENICE PINALES, et al.,**

**Plaintiffs,**

v.                                                                                           Civ. No. 11-1710 (GAG)

**JOSE E. FELICIANO-TORRES, et al.,**

**Defendants.**

## OPINION AND ORDER

Berenice Pinales, Jairon Constantino Suero-Reyes, Soueiry Suero-Pinales, and Aironelys Suero-Pinales ("Plaintiffs") sued Jose E. Feliciano-Torres, Rafael Lopez Garcia, Xavier Jimenez-Martinez, and Joe Doe (collectively "Defendants") for excessive force in violation of 42 U.S.C. § 1983 and supplemental state law claims. Defendants moved to summarily dismiss at Docket No. 76 and Plaintiffs opposed at Docket No. 91. For the following reasons, the court **DENIES** the motion for summary judgment at Docket No. 76.

**I.   STANDARD OF REVIEW**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of

1

**Civ. No. 11-1710 (GAG)**

the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

Civ. No. 11-1710 (GAG)

## II. RELEVANT FACTUAL BACKGROUND[1]

Juan Luis Suero-Pinales ("Decedent") worked as a handyman, occasionally with Carmelo de la Cruz-Gomez ("Cruz"). On August 22, 2010, Decedent and Liliana Mota Cordero ("Mota" or "female companion") went to a bar, where Decedent was quiet, tranquil, and not carrying any firearms. (Docket No. 93 at 2.)

Plaintiffs aver that Decedent and Mota heard gunshots at the bar, "El Coqui," and ran away together. (Id.) They exited together but took off in separate directions, and when Mota returned to the bar, Decedent was dead. (Id. at 2-3.) An eye witness, Bienvenido Adon Delgado ("Adon"), purportedly saw the following: the Decedent exited the bar, the police started to shoot, Decedent neither had a gun nor confronted the officers; rather, he was merely fleeing, and the police never found a gun when they searched for one in Decedent's proximity. (Id. at 3.)

This case surrounds the circumstances of Decedent's death on August 22, 2010 and the police officers who ended his life: Rafael Lopez-Garcia, Jose Feliciano-Torres, and Xavier Jimenez-Martinez. Their recollections of the events that night follow.

**Lopez**

Lopez has been a Puerto Rico police officer since 2007. By August 22, 2010, Lopez had been assigned to the Special Operations Division for two months. He was responsible for preventative patrolling in high crime areas and was serving a twelve-hour night shift in Officer Feliciano's patrol car. Lopez was the front passenger, while Jimenez sat in the back and Feliciano drove. The officers' sergeant instructed the trio to

---

[1] Plaintiffs admit numerous statements of fact filed by Defendants. (Docket No. 92.) Any citations of admitted facts will be omitted. (See Docket No. 77.) Any citations refer to contested or qualified facts.

3

patrol Rio Piedras, and they entered William Jones Street at approximately 5:00 a.m., when it was entirely dark, as part of a routine patrol.

The officers, while in the middle of the road, pulled up alongside El Coqui. They encountered a bouncer who offered them bottles of water. The bouncer entered the establishment to retrieve the water and the squad car pulled up to the end of the block to avoid jamming traffic. After they stopped the car, they all remained inside it. Shortly thereafter, the bouncer appeared with the bottles of water.

As the bouncer approached, the officers heard "many detonations," or gun shots. They exited the vehicle and sought cover. After finding cover, Lopez noticed that a white individual with braids and a large pistol exited El Coqui. Lopez identified himself, told the man to stop, and fired his rifle at him, but not his sidearm. The individual fell.

Lopez then heard more gunshots and sought cover. He saw another individual exit El Coqui. The individual, Decedent, ran towards the patrol car where Lopez sought cover. Decedent carried a silver-colored revolver. (Docket No. 77 at 4-5.) Plaintiffs claim Decedent was unarmed and exited El Coqui with a female companion, merely fleeing the scene to escape danger. (Docket No. 92 at 1-2.)

When Decedent ran past the patrol car, Lopez emerged and yelled, "Police, stop!" and Decedent "pointed and turned." Lopez shot at him with his rifle from approximately nine feet, but Decedent continued running. Plaintiffs deny Decedent pointed at Lopez because he was unarmed; rather, he simply kept running away from the bar. (Id. at 2.)

Lopez returned to the first individual because he saw him drag himself between cars while holding a gun. Lopez yelled, "Police, drop the gun," and the individual threw the firearm under the car and put his hands over his head. Lopez then remained with the first

4

individual and did not seize the gun; rather, an Officer Rodriguez took Lopez's gloves and seized the gun. Lopez recalls that the entire scenario happened very fast. Ultimately, several individuals were injured in the bar and on the street.

### **Feliciano**

Feliciano is also a member of the Special Operations Division and has been an officer since September 16, 2003. By August 22, 2010, he had been assigned to Special Operations for approximately a year and a half. Feliciano recalls the sequence of events exactly as Lopez did until the "detonations" began while the trio waited for the water from the bouncer.

When he heard gunshots, Feliciano immediately got out of the car, ran in front of it, and posted himself in the corner looking towards the bar. He claims he saw two or three people exit the bar, including one black man with a baseball cap and a "big nickel-colored gun in his hands." Feliciano claims he turned and ran towards the officers from between fifteen and twenty feet away. This individual was Decedent. Plaintiffs reiterate that Decedent exited the bar with a female companion and did not have a gun. (Docket No. 92 at 3.)

Feliciano states that Decedent next ran towards him and that he ordered Decedent to "Stop!" Decedent then raised his gun and pointed it at Feliciano, actuating the gun. Feliciano fired his weapon, shooting at Decedent's front. Plaintiffs reply that Decedent was merely fleeing the scene and had no gun; he was not threatening the police. (Id. at 4.) They also contend that the forensics report refutes Feliciano's testimony that he only fired at Decedent's front, and establishes that he fired ten times and that Decedent was hit seven times. (Id. at 4-5.)

**Civ. No. 11-1710 (GAG)**

Decedent continued to flee after being shot, crossing the street while holding onto his waste and casting his gun aside. Plaintiffs reiterate Decedent had no gun, though Feliciano believed Decedent had another weapon because he reached for his waste quickly. Decedent subsequently fell, Feliciano ran towards him, turned him on his back, and searched for a firearm. He found none. All of this happened in a matter of seconds.

Feliciano next returned to the gun that Decedent threw to the ground (Plaintiffs, for the sake of redundancy, dispute that Decedent had a gun). Two other municipal police officers were also at that specific location. Feliciano then found the man with braids lying on the ground, face down, with a gun lying eight feet away. According to Feliciano, Martinez seized the firearm. This does not align with Lopez's recounting. Plaintiff states that the record is contradictory "as to which firearm" was seized and tested – either a gray gun with a black rubber grip, or a nickel-plated one. (Id. at 8.)

### Jimenez-Martinez

Jimenez recites the opening facts of the events much like his colleagues. He states that the man with the braids opened the bar door, the officers heard "detonations," the man fell to his knees on the sidewalk, and more gunshots were heard. Jimenez ordered Decedent to stop and identified himself as the police. The Decedent pointed his gun while running, passed the car and turned, at which point Jimenez fired twice. Jimenez saw Decedent point his gun at Feliciano and fired upon Decedent from approximately ten feet away, hitting him in the side. Plaintiffs reiterate that Decedent did not have a gun, left with a female companion, and did not have the gun that was analyzed by the forensics unit; in contrast, they assert that the forensics unit only assessed one gun,

**Civ. No. 11-1710 (GAG)**

when there were supposedly two – one from the man with the braids, and one from Decedent.

### Police Incident Report

Defendants aver that two guns were recovered at the scene: a nickel-colored .357 Magnum and a nickel-colored Taurus pistol. Plaintiff asserts that the forensics report references only one gun. (Docket No. 92 at 10.) The sections of the forensics report Defendants cite only reference the Magnum, and Plaintiffs contend the report includes analysis of only one of the guns. All in all, the forensics report and the autopsy report conclude that Decedent was shot eight or seven times, respectively, and that Feliciano shot at Decedent ten times. (Docket No. 93 at 4-5.)

### III.  DISCUSSION

Defendants move to dismiss the Section 1983 claim for failure to present genuine issues of material fact. They also assert qualified immunity, and that the court should decline to exercise jurisdiction over the state-based claims if the Section 1983 claim is dismissed. The court **DENIES** the motion based on United States v. Zannino, 895 F.2d 1, 17 (1990), as well as genuine issues of material fact.

    A.    Excessive Force and Qualified Immunity

The First Circuit decided Zannino in 1990. This oft-cited case stands for the proposition that a court bears no duty to construct a party's argument based on conclusory assertions lacking analysis. Id. It is incumbent on a moving party to thoroughly apply the facts to the law to most effectively assist the court in reviewing a claim. It is not incumbent on the court to craft a party's argument.

The first six pages of Defendants' brief succinctly introduce the matter and detail the underlying facts, the next five pages are a general and thorough discussion of the summary judgment standard, and the following four pages recite informative Section 1983 and excessive force doctrine.  That takes the brief up to page 14, where the court sees room for improvement.

The section that seems to be Defendants' argument is simply a recitation of the facts in a story-like manner that includes bold words such as **reasonable** and **dismissed with prejudice**.  It does not assist the court in its particular examination and specific inquiry into whether the law entitles Defendants to dismissal based upon these unique facts.  The court would greatly benefit if Defendants applied the law to the facts and explained why their position is correct, based upon legal citations.  Zannino, 895 F.2d at 17.

Importantly, there exists a genuine issue of material fact.  Two eye witnesses say Decedent had no firearm and was merely fleeing El Coqui to avoid the shooting.  The police contend Decedent carried a gun and charged at them despite identifying themselves and commanding him to halt.  The court cannot weigh the credibility of these statements at this juncture.

The record presents two vastly different scenarios.  The first portrays a young man, brandishing a .357 Magnum, charging at police officers with the intent to harm them while disobeying their orders.  The second portrays a young man fleeing the scene of a shooting he was not a part of, where he had no firearm.  If a police officer shot someone who was preparing to fire on him at the scene of a crime, after warning the suspect and identifying himself as a police officer, that is one thing, and such a scenario

likely would entitle the officer to immunity. If a police officer intentionally shot an unarmed, fleeing citizen, that is quite another. See Tennessee v. Garner, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous person by shooting him dead.") The extent to which it was reasonable to believe that Decedent had participated in the shootings inside El Coqui, carried a gun, charged at the officers, and disobeyed their orders must be determined by the finder of fact.

Defendants next devote 3.5 pages to a helpful discussion of the generic governing standard for qualified immunity and finally reach a substantive argument of why they are entitled to immunity, to which they devote approximately one page. They provide no controlling law and attempt minimal discussion that neglects to weave together the facts and law.

Additionally, the facts on which Defendants base entitlement to immunity are disputed. Whether they reasonably believed their lives were endangered by Decedent remains a question of fact: whether Decedent had a gun, whether he was merely fleeing or charging the officers, whether he disobeyed them, and whether the eyewitnesses or the police were correct in their recollections. See Morelli v. Webster, 552 F.3d 12, 24-25 (1st Cir. 2009) ("[W]hether under the plaintiff's version of the facts a reasonable officer should have known that the degree of force used was plainly excessive."). Defendants may be entitled to immunity, but it would be premature to declare so at this stage. Defendants' motion as to the excessive force and qualified immunity claims is **DENIED**.

    B.    <u>State Claims</u>

Defendants move to dismiss the state-based claims on the assumption that the court will dismiss the federal claim, asking the court to refrain from exercising

**Civ. No. 11-1710 (GAG)**

jurisdiction over the state-based claims. Defendants' motion to dismiss the state-based claims is **DENIED.**

## IV.   CONCLUSION

For the reasons stated above, the court **DENIES** Defendants' motion for summary judgment at Docket No. 76.

It is **SO ORDERED** this 9th day of January, 2014.

/s/ Gustavo A. Gelpi
Hon. Gustavo A. Gelpi
United States District Judge